**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| 1-800 CONTACTS, INC.,<br><br>    Plaintiff,<br><br>  v.<br><br>JAND, INC. d/b/a WARBY PARKER, now known as, WARBY PARKER INC.,<br><br>    Defendant. | Case No. 21 Civ. 06966 (PKC)<br><br>ORAL ARGUMENT<br>REQUESTED |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S OPPOSITION TO**
**DEFENDANT'S MOTION FOR JUDGMENT ON THE PLEADINGS**

**Table of Contents**

<u>Page</u>

TABLE OF AUTHORITIES ...................................................................................... iii

PRELIMINARY STATEMENT ................................................................................. 1

FACTUAL BACKGROUND ...................................................................................... 4

      A.    1-800 Contacts ............................................................................... 4

      B.    Warby ............................................................................................ 5

      C.    Consumer Use of Search Engines and Search Advertising ......................... 5

      D.    Warby's Plan to Use the 1-800 CONTACTS Marks for Search Advertising .................................................................................. 6

      E.    Impact of Warby's Search Advertising Practices ......................................... 9

ARGUMENT ............................................................................................................ 9

      I.    1-800 CONTACTS HAS PLAUSIBLY ALLEGED THAT WARBY'S USE OF THE 1- 800 CONTACTS MARKS CREATES A LIKELIHOOD OF CONFUSION. ............................................................................ 11

            1.    *Strength of the 1-800 CONTACTS Marks* .................................. 13

            2.    *The Marks Used by the Parties are Identical* ............................... 13

            3.    *The Parties Offer Identical Categories of Goods and Services* ..... 14

            4.    *Warby's Bad Faith Use of the 1-800 CONTACTS Marks* ............. 14

            5.    *Actual Confusion* ....................................................................... 15

            6.    *Sophistication of Consumers in the Relevant Market* ................... 17

      II.    WARBY'S ARGUMENTS THAT 1-800 CONTACTS HAS NOT SUFFICIENTLY PLED LIKELIHOOD OF CONFUSION FAIL. ...................... 19

      A.    No Heightened Lanham Act Pleading Standard Exists for Claims Based on Search Engine Keyword Bidding. .................................. 19

            1.    *Warby Is Wrong That 1-800 Contacts Must Plead "More" Than Warby's Bidding on 1-800 Contacts as a Keyword and Displaying Search Advertisements to Show Likelihood of Confusion* ................................................................................. 19

2.    *Warby Is Wrong That Plaintiffs Are Required to Show Intentional Deception In Trademark Infringement Cases* .............21

B.    No Obligation to Assert an Independent Trade Dress Infringement Claim Exists in Order for Warby's Imitation of 1-800 Contacts' Website to be Relevant. ..............................................................................22

CONCLUSION...........................................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*1-800 Contacts, Inc. v. FTC,*
 1 F.4th 102 (2d Cir. 2021) ..................................................................................................3

*Allied Interstate LLC v. Kimmel & Silverman P.C.,*
 No. 12 Civ. 4204 (LTS)(SN), 2013 U.S. Dist. LEXIS 113465 (S.D.N.Y. Aug.
 12, 2013) ...........................................................................................................................15

*Alzheimer's Disease & Related Disorders Ass'n, Inc. v. Alzheimer's Found. of
 Am., Inc.,*
 307 F. Supp. 3d 260 (S.D.N.Y. 2018)...............................................................................13

*Arrow Fastener Co. v. Stanley Works,*
 59 F.3d 384 (2d Cir. 1995)...........................................................................................11, 13

*BigStar Ent., Inc. v. Next Big Star, Inc.,*
 105 F. Supp. 2d 185 (S.D.N.Y. 2000)................................................................................22

*Bihari v. Gross,*
 119 F. Supp. 2d 309 (S.D.N.Y. 2000)................................................................................22

*Boost Beauty LLC v. Woo Signatures, LLC,*
 2:18-cv-02960, 2018 U.S. Dist. LEXIS 227156 (C.D. Cal. July 23, 2018) ...........................21

*Brennan's, Inc. v. Brennan's Rest., L.L.C.,*
 360 F.3d 125 (2d Cir. 2004)................................................................................................14

*Cadbury Beverages v. Cott Corp.,*
 73 F.3d 474 (2d Cir. 1996)........................................................................................ passim

*Car-Freshner Corp. v. Am. Covers, LLC,*
 980 F.3d 314 (2d Cir. 2020)................................................................................................11

*Caraway Home, Inc. v. Pattern Brands, Inc.,*
 20 Civ. 10469, 2021 U.S. Dist. LEXIS 64364 (S.D.N.Y. April 1, 2021)...........................4, 23

*Century 21 Real Estate, LLC v. Raritan Bay Realty, Ltd.,*
 CV 07-1455 (JO), 2008 U.S. Dist. LEXIS 109507 (S.D.N.Y. July 24, 2008) ......................13

*CJ Prods. LLC v. Snuggly Plushez LLC,*
 809 F. Supp. 2d 127 (E.D.N.Y 2011) ...........................................................................18, 24

*Classic Liquor Importers, Ltd. v. Spirits Int'l B.V.*,
201 F. Supp. 3d 428 (S.D.N.Y. 2016)........................................................................17

*ESPN, Inc. v. Quiksilver, Inc.*,
586 F. Supp. 2d 219 (S.D.N.Y. 2008)......................................................................11

*Ezra v. Weitz & Luxenberg, P.C.*,
794 F. App'x 27 (2d Cir. 2019) ...............................................................................10

*Hearts on Fire Co. v. Blue Nile, Inc.*,
603 F. Supp. 2d 274 (D. Mass. 2009) ......................................................................23

*Infostream Group Inc. v. Avid Life Media Inc.*,
No. CV 12-09315 DDP, 2013 U.S. Dist. LEXIS 161940 (C.D. Cal. Nov. 12,
2013) ...................................................................................................................20, 21

*J.G. Wentworth, S.S.C. Ltd. P'ship v. Settlement Funding LLC*,
No. 06-0597, 2007 U.S. Dist. LEXIS 288 (E.D. Pa. Jan. 4, 2007).........................21

*Joules Ltd. v. Macy's Merch. Grp., Inc.*,
695 F. App'x 633 (2d Cir. 2017) .............................................................................14

*Kelly-Brown v. Winfrey*,
717 F.3d 295 (2d Cir. 2013)....................................................................................12

*Kid Car NY, LLC v. Kidmoto Techs. LLC*,
518 F. Supp. 3d 740 (S.D.N.Y. 2021) (Castel, J.) ...................................2, 10, 11, 12

*Kraft Gen. Foods, Inc. v. Allied Old English, Inc.*,
831 F. Supp. 123 (S.D.N.Y. 1993) ..........................................................................18

*L-7 Designs, Inc. v. Old Navy, LLC*,
647 F.3d 419 (2d Cir. 2011)....................................................................................10

*LBF Travel, Inc. v. Fareportal, Inc.*,
No. 13 Civ. 9143 (LAK) (GWG), 2014 U.S. Dist. LEXIS 156583 (S.D.N.Y.
Nov. 5, 2014) .....................................................................................................11, 12

*Lively v. WAFRA Inv. Advisory Grp., Inc.*,
6 F.4th 293 (2d Cir. 2021) ....................................................................................9, 10

*Louis Vuitton Malletier v. Dooney & Bourke, Inc.*,
454 F.3d 108 (2d Cir. 2006)....................................................................................11

*Marks Org., Inc. v. Joles*,
784 F. Supp. 2d 322 (S.D.N.Y. 2011)......................................................................12

*Maternally Yours, Inc. v. Your Maternity Shop, Inc.*,
    234 F.2d 538 (2d Cir. 1956)................................................................................4, 23

*MetLife, Inc. v. Metro. Nat'l Bank*,
    388 F. Supp. 2d 223 (S.D.N.Y. 2005) (Castel, J.) ...................................................17

*Mobil Oil Corp. v. Pegasus Petroleum Corp.*,
    818 F.2d 254 (2d Cir. 1987)....................................................................................16

*N.Y. State Soc'y of Certified Pub. Accts. v. Eric Louis Assocs., Inc.*,
    79 F. Supp. 2d 331 (S.D.N.Y. 1999)........................................................................24

*Novation Ventures, LLC v. J.G. Wentworth Co.*,
    CV 15-00954, 2015 U.S. Dist. LEXIS 188001 (C.D. Cal. Sept. 21, 2015)............................21

*Polaroid Corp. v. Polarad Elecs. Corp.*,
    287 F.2d 492 (2d Cir. 1961)................................................................. passim

*Rescuecom Corp. v. Google Inc.*,
    562 F.3d 123 (2d Cir. 2009)................................................................. passim

*Rolex Watch U.S.A., Inc. v. Jones*,
    99 Civ. 2359 (DLC), 2000 U.S. Dist. LEXIS 15082 (S.D.N.Y. Oct. 13, 2000).....................13

*Rosetta Stone. Ltd. v. Google, Inc.*,
    676 F.3d 144 (4th Cir. 2012) .............................................................................18, 19

*Savin Corp. v. Savin Grp.*,
    391 F.3d 439 (2d Cir. 2004)...............................................................16, 19, 21, 22

*Select Comfort Corp. v. Baxter*,
    996 F.3d 925 (8th Cir. 2021) .............................................................16, 17, 18, 19

*Sola Franchise Corp. v. Solo Salon Studios, Inc.*,
    CV 14-946 (JS) 2015 U.S. Dist. LEXIS 38490 (E.D.N.Y. Feb. 9, 2015) .............................11

*Soter Techs., LLC v. IP Video Corp.*,
    523 F. Supp. 3d 389 (S.D.N.Y. 2021)....................................................................11

*Star Indus. v. Bacardi & Co.*,
    412 F.3d 373 (2d Cir. 2005)................................................................................11, 19

*Time, Inc. v. Petersen Publ'g Co.*,
    173 F.3d 113 (2d Cir. 1999)................................................................................10

**OTHER AUTHORITIES**

David A. Hyman & David J. Franklyn, *Trademarks as Search-Engine Keywords:*
    *Who, What, When?*, 92 TEX. L. REV. 2117, 2127, 2146 (2014) ................................................6

4 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 23.6
    (5th ed. 2010) ........................................................................................................16

Rule 9(b) of the Federal Rules of Civil Procedure ......................................................22

Rule 12(b)(6) of the Federal Rules of Civil Procedure.............................................10, 11

Rule 12(c) of the Federal Rules of Civil Procedure....................................................9, 10

**PRELIMINARY STATEMENT**

Over the past three decades, Plaintiff 1-800 Contacts, Inc. ("1-800 Contacts") has spent hundreds of millions of dollars building and maintaining strong consumer recognition of its business, services, and trademarks.  During that time, 1-800 Contacts has sold contact lenses through its 1800contacts.com website under its distinctive and registered trademarks, which include the designation "1 800 Contacts" and variations thereof.  1-800 Contacts' sustained investment and decades-long commitment to providing unparalleled customer service has paid off, and the company serves millions of satisfied customers.

In stark contrast to 1-800 Contacts, Defendant JAND, Inc., now known as Warby Parker ("Warby"), is a new entrant in the contact lens sales market.  Approximately two years ago, when Warby began selling contact lenses, it hatched a plan to free ride on 1-800 Contacts' massive investments and to intentionally deceive consumers who search online for 1-800 Contacts by misdirecting them to a Warby website that mimics the format and coloring of 1-800 Contacts' website.  To carry out its deliberate strategy, Warby began bidding on and purchasing 1-800 Contacts' trademarks—including 1-800 Contacts' brand name and the specific URL of 1-800 Contacts' website (1800contacts.com)—as keywords on Google and other Internet search engines to facilitate its sale of identical products.

As a result of Warby's keyword bidding, when a consumer searches for "1800 contacts" or types the 1800contacts.com domain name into a search engine, an advertisement including a link to Warby's website appears at or near the top of the search results page.  Not only do these advertisements fail to identify Warby as an unaffiliated competitor of 1-800 Contacts, but they

1

also direct consumers who click on the ads to a "deep-linked"[1] webpage that Warby intentionally designed to mimic the formatting and coloring of 1-800 Contacts' website.  Warby's keyword bidding on 1-800 Contacts' trademarks has confused, and will continue to confuse consumers, which is precisely what Warby intends.  In an effort to prevent consumers who search for 1-800 Contacts from falling prey to Warby's unlawful conduct and to eliminate further confusion, 1-800 Contacts has been forced to spend substantial sums on internet search advertising auctions by attempting to outbid Warby virtually every day just to protect its own trademarks.  Through this lawsuit, 1-800 Contacts seeks to protect its valuable trademarks and to end Warby's unauthorized and deceptive use of those marks.

To defeat Warby's Motion for Judgment on the Pleadings, 1-800 Contacts' Complaint need only allege that an appreciable number of ordinary, prudent purchasers are likely to be misled or confused as to the source of the goods or services Warby offers.  The facts alleged in 1-800 Contacts' Complaint easily satisfy that standard.  And even if there were any doubt, which there should not be, courts, including this Court, have repeatedly emphasized that likelihood of confusion is a "fact-intensive" inquiry that can rarely be resolved at the pleading stage.  *E.g.*, *Kid Car NY, LLC v. Kidmoto Techs. LLC*, 518 F. Supp. 3d 740, 758-60 (S.D.N.Y. 2021) (Castel, J.). As 1-800 Contacts' extensive factual allegations demonstrate, this is not one of those "rare" cases.

Tellingly, Warby's Motion does not acknowledge the fact-specific nature of the likelihood of confusion inquiry or even mention the well-established multi-factor test for analyzing likelihood of confusion in the Second Circuit—the *Polaroid* factors.  *See Polaroid*

---

[1] "Deep linking" is the use of a hyperlink that takes the user to a specific page on a website, rather than the website's homepage.  *See* https://en.wikipedia.org/wiki/Deep_linking (last visited Jan. 7, 2022).

*Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492 (2d Cir. 1961). And analysis of the *Polaroid* factors leaves no doubt that 1-800 Contacts' Complaint sufficiently alleges likelihood of confusion. Rather than address this well-established standard, Warby engages in misleading rhetoric by accusing 1-800 Contacts of being anticompetitive—a conclusion the Second Circuit recently, and soundly, rejected. *See 1-800 Contacts, Inc. v. FTC*, 1 F.4th 102, 109, 120 (2d Cir. 2021) ("Efforts to protect trademarks . . . serve the competitive purpose of furthering trademark policies.") (alteration and internal quotation marks omitted).

Warby also asks this Court to apply a new, heightened burden to 1-800 Contacts' claims—which it vaguely describes as a something "more" standard. But the Second Circuit has not adopted Warby's standard. Indeed, Warby's contention that its admitted bidding on 1-800 Contacts' trademarks and displaying of intentionally confusing advertisements and linked webpages cannot constitute trademark infringement contradicts Second Circuit precedent. *See Rescuecom Corp. v. Google Inc.*, 562 F.3d 123, 126-31 (2d Cir. 2009) (rejecting dismissal as a matter of law where plaintiff alleged only that a search engine used plaintiff's trademarks to trigger competitor advertisements). Additionally, even if Warby were correct about a heightened standard, the detailed allegations in 1-800 Contacts' Complaint would easily satisfy it.

Similarly, Warby's attempt to create a standalone "intentional deception" element for trademark infringement claims on the Internet is without support. Courts, including the Second Circuit, have not required plaintiffs to plead "intentional deception" to state a claim for trademark infringement involving search advertising. *See id.* at 130-31. And again, even if such a requirement existed, 1-800 Contacts' Complaint would plainly satisfy it. This is particularly true where consumer deception is the direct and intended result of Warby's conduct and where

3

Warby readily admits that it intentionally uses 1-800 Contacts' trademarks *to sell contact lenses more easily*. Answer ¶¶ 55-57; *see also* Compl. ¶¶ 55-57.

Finally, Warby misses the mark in arguing that its mimicking of 1-800 Contacts' website is irrelevant because 1-800 Contacts has not asserted a trade dress infringement claim in this action. There is no legal requirement that 1-800 Contacts assert an independent trade dress infringement claim for the formatting and coloring of its website and of Warby's deep-linked ad page to be relevant here. In fact, courts routinely find website design elements and similar factors relevant to the likelihood of confusion analysis for asserted trademark infringement and unfair competition claims even when independent trade dress infringement claims are not asserted or successful. *See, e.g.*, *Caraway Home, Inc. v. Pattern Brands, Inc.*, 20 Civ. 10469, 2021 U.S. Dist. LEXIS 64364, at *25-28 (S.D.N.Y. April 1, 2021); *Maternally Yours, Inc. v. Your Maternity Shop, Inc.*, 234 F.2d 538, 543 (2d Cir. 1956).

In sum, 1-800 Contacts has plausibly pled the required elements to support its claims, and Warby's misguided Motion fails to satisfy the heavy burden it bears in asking this Court to dismiss 1-800 Contacts' Complaint. For these reasons, Warby's Motion should be denied.

## FACTUAL BACKGROUND

### A. 1-800 Contacts

1-800 Contacts has sold contact lenses through its 1800contacts.com website since 1996 under its distinctive "1 800 CONTACTS" trademark and variations thereof (collectively, the "1-800 CONTACTS Marks"). Compl. ¶¶ 21-22. The 1-800 CONTACTS Marks include several federally registered trademarks containing variations of the term "1 800 Contacts," including an incontestable registration for the 1800CONTACTS mark. *Id.* ¶ 22, Ex. 9.

In the 25 years it has operated its 1800contacts.com website, 1-800 Contacts has invested hundreds of millions of dollars to develop valuable customer recognition and goodwill through

4

extensive advertising, marketing, promotion, advocacy, and customer service.  *Id.* ¶¶ 1-2, 25-31.

1-800 Contacts makes substantial sales under the 1-800 CONTACTS Marks, and it now serves

millions of customers.  *Id.*

Since 1996, 1-800 Contacts' homepage, 1800contacts.com, has featured the color blue,

and it has prominently featured a shade of light blue for more than a decade.  *Id.* ¶ 68, Ex. 3.

Additionally, since April 2020, the homepage has included a light blue rectangular shaded box

that spans most of the screen in a horizontal configuration and displays representative contact

lens product packaging to the right of a discount offer to "Get 20% off your first order."  *Id.*

## B.  Warby

Warby was founded in 2010 and until recently, sold only eyeglasses and sunglasses

online and in brick-and-mortar stores.  *Id.* ¶¶ 49-52.  Approximately two years ago, in November

2019, Warby began selling contact lenses.  *Id.* ¶ 52; *see also* Def. Mot. at 3.

## C.  Consumer Use of Search Engines and Search Advertising

One way that companies pay to advertise products on the Internet is through "search

advertising," which involves advertisers (such as 1-800 Contacts or Warby) bidding on keywords

in consumer online searches that generate paid search results in auctions hosted by search

engines such as Google or Bing.  Compl. ¶¶ 32-33; *see generally Rescuecom*, 562 F.3d at 125-

27.  Online shoppers see these paid search result advertisements as well as natural search results

when they complete a search.  Compl. ¶¶ 33-35.  Paid advertisements generally appear first in

the search results accompanied by a small designation signaling they are an "Ad," followed by

the natural search results, with no delineated border between where the list of paid

advertisements ends and the natural search results begin.  *Id.* ¶¶ 38, 58, 81, Exs. 2 & 8.

However, when consumers search for the brand name or trademark of a retailer on a search

5

engine, they intend to navigate to the website of the retailer for which they searched.[2]  *Id.* ¶¶ 4, 47, 63-65.  Consumers expect that the initial links displayed in response to their search will take them to the retailer's official website.[3]  *Id.*

### D.  Warby's Plan to Use the 1-800 CONTACTS Marks for Search Advertising

When Warby began selling contact lenses in or around November 2019, it wanted a shortcut to success.  Warby therefore designed a plan to exploit these ingrained consumer expectations and to confuse consumers who intend to navigate to 1-800 Contacts' website by misdirecting them to Warby's website.  *Id.* ¶¶ 4-7, 63-65.  To execute its plan, Warby began bidding on and purchasing the 1-800 CONTACTS Marks as keywords on Google and other Internet search engines.  *Id.* ¶ 56.  Warby even bids on the "1800contacts.com" domain name— one of the 1-800 CONTACTS Marks—as a Google Ads keyword in an effort to deceive and misdirect consumers who mistakenly type 1-800 Contacts' well-known domain name into the search bar, rather than the address bar, of their browser in an obvious effort to navigate to 1-800 Contacts' website.  *Id.* ¶¶ 80-82, Ex. 8.  Warby admits it engaged in the basic elements of this scheme.  Def. Mot. at 3.

As a result of Warby's keyword bidding, when a consumer searches for "1800 contacts" or a similar phrase on Google (or types 1-800 Contacts' domain name into a search engine), an advertisement including a link to Warby's website appears at or near the top of the search results

---

[2] *See, e.g.*, Anindya Ghose & Sha Yang, *An Empirical Analysis of Search Engine Advertising: Sponsored Search in Electronic Markets*, 55 MGMT. SCI. 1605, 1617 (2009) ("Retailer name searches are navigational searches and are analogous to a user finding the retailer's [] address in the White Pages. . . .  In contrast, searches on product or manufacturer-specific names are analogous to consumers going to the Yellow Pages—they know they need a branded product, but don't yet know where to buy it . . . .  [R]etailer-specific keywords are likely to be searched for and clicked by 'loyal' consumers who are inclined to buying from that retailer . . . .").

[3] Only about six percent of search engine keyword purchases for trademarks are by competitors of the trademark owner.  *See* David A. Hyman & David J. Franklyn, *Trademarks as Search-Engine Keywords: Who, What, When?*, 92 TEX. L. REV. 2117, 2127, 2146 (2014).

page. Compl. ¶¶ 58-59, 80-82, Exs. 2 & 8; Def. Mot. at 3. Warby admits that the advertisements displayed in response to these searches do not identify Warby in the headline ("15% Off First Contacts Order – 90 Daily Contacts for Only $55") or in the content of the advertisement ("Save 15% on your first order of contact lenses with us—and get free shipping."). Compl. ¶¶ 58, 60, Exs. 2 & 8; Def. Mot. at 12. Nor do Warby's advertisements indicate that Warby's website is not affiliated with 1-800 Contacts or that Warby is 1-800 Contacts' competitor. Compl. ¶¶ 58, 60, Exs. 2 & 8. The only reference to Warby in the advertisement is in the URL, which is listed in very small black letters above the headline and is less prominent in color and size than the conspicuous, larger, and bright blue advertisement headline and other ad features. *Id.* ¶¶ 58-62, Exs. 2 & 8. Consumers who scan the search results, particularly on a mobile device displaying fewer search results on the initial page, will focus on the larger, brighter-colored, and more conspicuous ad text and not notice, or understand the significance of, the smaller, black domain name or "Ad" text, particularly because 1-800 Contacts uses paid search advertisements for its own marks displaying the same "Ad" designation. *Id.*

To support its plan to create confusion and more easily make online sales for itself at 1-800 Contacts' expense, Warby does not direct consumers who click on the ads displayed in response to searches for the 1-800 CONTACTS Marks to Warby's standard homepage, which has a predominantly brown background and features pictures of people wearing eyeglasses. *Id.* ¶¶ 76-77, Ex. 7. Instead, Warby leads the consumer to its "deep-linked" webpage (the "Deep Linked Ad Page"). *Id.* ¶ 66. Unlike Warby's homepage (which has a predominantly brown background) and the other main webpages at Warby's website (none of which has a predominantly blue background), Warby's Deep Linked Ad Page generally displays a rectangular box in light blue, features contact lens product packaging images on the right side of

7

the light blue box, and on the left side of the light blue box lists a discount offer to "Get 15% off your first contacts order."[4]  *Id.* ¶ 70, Ex. 4.  The contact lens packaging images on the Deep Linked Ad Page include some of the same products shown on 1-800 Contacts' homepage.  *See id.* ¶ 70, Exs. 3 & 4.  The format and color scheme of the Deep Linked Ad Page are similar to the format and color scheme of 1-800 Contacts' homepage and are very different from the format and color scheme used elsewhere on Warby's website.  *Id.* ¶ 10, Ex. 3.



**Exhibit 3**



**Exhibit 4**

In contrast to the ads Warby displays in response to searches for the 1-800 CONTACTS Marks, Warby directs consumers who search on Google for "Warby Parker contacts" to a different landing page that has a white background, says on the right side of the screen that "We offer a variety of daily, bi-weekly, and monthly contact lenses—including our own daily lenses, Scout by Warby Parker," and features contact lens product packaging images on the left side of the screen.  *Id.* ¶ 75, Ex. 5.  The Deep Linked Ad Page also differs substantially from Warby's other webpages.  *Id.* ¶¶ 76-77, Ex. 7.  In fact, other than the Deep Linked Ad Page to which consumers specifically searching for 1-800 Contacts are directed, none of the other category

---

[4] The descriptions in this brief are of Warby's ads and webpages as of the date the Complaint was filed and screenshots attached as exhibits to the Complaint were captured.

pages on Warby's website (*e.g.*, Home Try-On, Eyeglasses, Sunglasses, and Get a Prescription) feature a light blue color. *Id.* ¶ 77.



**Exhibit 5**



**Exhibit 7**

### E. Impact of Warby's Search Advertising Practices

Warby's keyword bidding for the 1-800 CONTACTS Marks confuses consumers into clicking on Warby's paid advertisements, incorrectly believing them to be affiliated with 1-800 Contacts. *Id.* ¶¶ 12, 83. This confusion is exacerbated because Warby's source-ambiguous ads misdirect consumers to the source-ambiguous Deep Linked Ad Page, which consumers also mistakenly believe is affiliated with 1-800 Contacts. *Id.* The result is that Warby capitalizes on this confusion to make, or attempt to make, contact lens sales it would otherwise not have made. *Id.* ¶ 12. Additionally, 1-800 Contacts has been forced to spend substantial sums to combat this consumer confusion by attempting to outbid Warby virtually every day just to ensure that consumers who search for 1-800 Contacts and its trademarks are able to find the business they search for. *Id.* ¶ 84.

## ARGUMENT

To defeat a motion for judgment on the pleadings under Rule 12(c) of the Federal Rules of Civil Procedure, a plaintiff need only plead enough facts to state a claim for relief that is plausible on its face. *Lively v. WAFRA Inv. Advisory Grp., Inc.*, 6 F.4th 293, 301-02 (2d Cir.

2021).  In evaluating a Rule 12(c) motion brought by a defendant, the court may consider the answer and attachments thereto.  *See L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 422 (2d Cir. 2011).  However, the defendant may not seek judgment on the basis of disputed facts that are plausibly alleged in the plaintiff's complaint.  *See, e.g.*, *Lively*, 6 F.4th at 301-02.  Thus, as with a Rule 12(b)(6) motion, when considering a Rule 12(c) motion, courts proceed by "construing the complaint liberally, accepting all factual allegations as true, and drawing all reasonable inferences in the plaintiff's favor."  *Ezra v. Weitz & Luxenberg, P.C.*, 794 F. App'x 27, 28 (2d Cir. 2019) (internal quotation marks omitted).

To plead trademark infringement and unfair competition, a plaintiff must allege (1) that it has a valid mark entitled to protection, and (2) that the defendant's use of the mark is likely to cause confusion as to the origin or sponsorship of the product at issue.  *Time, Inc. v. Petersen Publ'g Co.*, 173 F.3d 113, 117 (2d Cir. 1999).

Here, Warby does not dispute that 1-800 Contacts has valid trademarks entitled to protection under the law.  And Warby concedes that, under binding Second Circuit precedent, its purchase of the 1-800 CONTACTS Marks constitutes "use in commerce" under the Lanham Act. *Rescuecom*, 562 F.3d at 127; *see* Def. Mot. at 3, 8.  Thus, the sole issue for this Court to resolve is whether 1-800 Contacts has pled sufficient facts, taken as true, to plausibly allege a likelihood of consumer confusion.  To do so, 1-800 Contacts need only show "any likelihood that an appreciable number of ordinarily prudent purchasers are likely to be misled, *or indeed simply confused*, as to the source of the goods or services in question."  *Kid Car*, 518 F. Supp. 3d at 758 (quoting *Savin Corp. v. Savin Grp.*, 391 F.3d 439, 456 (2d Cir. 2004) (emphasis added) (brackets omitted)).  And 1-800 Contacts' factual allegations are more than sufficient to satisfy this burden.

### I.  1-800 CONTACTS HAS PLAUSIBLY ALLEGED THAT WARBY'S USE OF THE 1-800 CONTACTS MARKS CREATES A LIKELIHOOD OF CONFUSION.

Although Warby's Motion neglects to address it, the test for determining likelihood of confusion—the *Polaroid* factors test—is well-established in the Second Circuit.  *See, e.g.*, *Kid Car*, 518 F. Supp. 3d at 758; *Car-Freshner Corp. v. Am. Covers, LLC*, 980 F.3d 314, 327 (2d Cir. 2020); *LBF Travel, Inc. v. Fareportal, Inc.*, No. 13 Civ. 9143 (LAK) (GWG), 2014 U.S. Dist. LEXIS 156583, at *24-25 (S.D.N.Y. Nov. 5, 2014).[5]  The *Polaroid* factors are a non-exhaustive list of considerations courts use to evaluate whether a defendant's use of a trademark creates a likelihood of confusion.[6]  *Kid Car*, 518 F. Supp. 3d at 758.  The factors include: (1) strength of the plaintiff's marks; (2) similarity of the marks used; (3) competitive proximity of the products; (4) defendant's bad faith in adopting the mark; (5) actual confusion; (6) the likelihood of plaintiff bridging any gap between the parties' goods and services used in connection with the marks at issue;[7] (7) quality of defendant's products;[8] and (8) sophistication of the consumers.  *Id*.

---

[5] Warby's failure to address the *Polaroid* factors is, in itself, sufficient to deny Warby's Motion.  *See, e.g.*, *Soter Techs., LLC v. IP Video Corp.*, 523 F. Supp. 3d 389, 405 (S.D.N.Y. 2021) (denying Rule 12(b)(6) motion in similar context in part because the defendant failed to "substantially dispute that Plaintiff has satisfied the [*Polaroid*] balancing test"); *Arrow Fastener Co. v. Stanley Works*, 59 F.3d 384, 399 (2d Cir. 1995) (emphasizing "the importance of a thorough, delineated analysis of the eight *Polaroid* factors by district courts in trademark cases").

[6] 1-800 Contacts' federal and New York trademark infringement and unfair competition causes of action are subject to identical analyses.  *See Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 454 F.3d 108, 114, 119 (2d Cir. 2006) (applying the same standard to Lanham Act trademark infringement and unfair competition claims); *ESPN, Inc. v. Quiksilver, Inc.*, 586 F. Supp. 2d 219, 230 (S.D.N.Y. 2008) (applying Lanham Act standard to New York trademark infringement and unfair competition claims).

[7] Where, as here, the senior user's (1-800 Contacts) and the junior user's (Warby) services are "already in competitive proximity, there is really no gap to bridge, and this factor is irrelevant to the *Polaroid* analysis in this case."  *Star Indus. v. Bacardi & Co.*, 412 F.3d 373, 387 (2d Cir. 2005).

[8] Here, the Complaint emphasizes that Warby is in the identical business of selling contact lenses, which are produced by the same manufacturers and thus equivalent across retailers.  Compl. ¶¶ 1-12, 18, 21-31, 52-53.  As courts have explained, such allegations "sufficiently state this *Polaroid* factor, at least indirectly, to make out a cause of action based on likelihood of confusion."  *Sola Franchise Corp. v. Solo Salon Studios, Inc.*, CV 14-946 (JS)

11

Not all factors need to be shown to establish a likelihood of confusion, and, "at a motion to dismiss stage, courts have not required all factors to be addressed in order to find adequate pleading of a likelihood of confusion." *Id.* at 759 (quotation marks omitted) (quoting *World Trade Ctrs. Ass'n v. Port Auth. of N.Y. & N.J.*, No. 15 CV 7411-LTS, 2016 U.S. Dist. LEXIS 173621, at *5-6 (S.D.N.Y. Dec. 15, 2016) (collecting cases)). As courts have explained, "[a]lthough no one factor is dispositive, . . . the first three factors"—the strength of the plaintiff's marks, the similarity between the marks used, and the proximity of the products in the marketplace—"are the most significant" for purposes of the *Polaroid* test. *Marks Org., Inc. v. Joles*, 784 F. Supp. 2d 322, 330 (S.D.N.Y. 2011).

Under the *Polaroid* test, the ultimate inquiry—whether, based on a totality of the circumstances, consumers are likely to be confused—is fact-intensive. *Kid Car*, 518 F. Supp. 3d at 759; *see also Kelly-Brown v. Winfrey*, 717 F.3d 295, 307 (2d Cir. 2013) (vacating dismissal of trademark infringement claim and noting that "the *Polaroid* test, which we have long used, is a fact-intensive inquiry that depends greatly on the particulars of each case"). Courts, including this Court, have therefore repeatedly emphasized that likelihood of confusion can rarely be resolved at the pleading stage. *See, e.g.*, *Kid Car*, 518 F. Supp. 3d at 758, 760; *LBF Travel*, 2014 U.S. Dist. LEXIS 156583, at *25-26.

In the instant case, application of the *Polaroid* factors demonstrates that 1-800 Contacts has alleged more than sufficient facts to plead a likelihood of confusion.

---

(AKT) 2015 U.S. Dist. LEXIS 38490, at *24-25 (E.D.N.Y. Feb. 9, 2015). Thus, this factor is not addressed in detail herein.

### 1.   *Strength of the 1-800 CONTACTS Marks*

First, 1-800 Contacts plausibly alleges that its trademarks are extremely strong due to its nearly thirty years in business selling contact lenses, the hundreds of millions of dollars it has spent developing its brand and reputation for excellent customer service, and the millions of customers it now serves.  *See* Compl. ¶¶ 1-2, 21-31, 89; *Rolex Watch U.S.A., Inc. v. Jones*, 99 Civ. 2359 (DLC), 2000 U.S. Dist. LEXIS 15082, at *7 (S.D.N.Y. Oct. 13, 2000) (noting "plaintiffs have enhanced the strength of their marks by vigorously advertising their products"); *Alzheimer's Disease & Related Disorders Ass'n, Inc. v. Alzheimer's Found. of Am., Inc.*, 307 F. Supp. 3d 260, 288 (S.D.N.Y. 2018) (trademark strength "is probative of confusion here because . . . a user searching for a distinctive term is more likely to be looking for a particular product, and therefore could be more susceptible to confusion when sponsored links appear that advertise a similar product from a different source").  Moreover, the 1-800 CONTACTS Marks are "presumed to be strong by virtue of being registered."  *Century 21 Real Estate, LLC v. Raritan Bay Realty, Ltd.*, CV 07-1455 (CPS) (JO), 2008 U.S. Dist. LEXIS 109507, at *13 (S.D.N.Y. July 24, 2008); *see also Arrow Fastener*, 59 F.3d at 393 n.6.  For these reasons, this factor plainly weighs in 1-800 Contacts' favor.

### 2.   *The Marks Used by the Parties are Identical*

Second, the marks used by the parties are identical.  Warby does not dispute that it intentionally bids on and uses the 1-800 CONTACTS Marks to advertise contact lens products and services and that these are identical to the marks 1-800 Contacts uses to advertise its contact lens products and services.  *See* Compl. ¶¶ 56, 66; Answer ¶ 56; Def. Mot. At 3.  Accordingly, this factor also weighs heavily in 1-800 Contacts' favor.  *See, e.g.*, *Cadbury Beverages v. Cott Corp.*, 73 F.3d 474, 480 (2d Cir. 1996).

13

### 3.  *The Parties Offer Identical Categories of Goods and Services*

Third, the parties offer identical categories of goods and services.  Not only do 1-800 Contacts and Warby sell the same category of goods (*i.e.*, contact lenses) in the same channels of trade (*i.e.*, online), but they sell many of the same contact lens brands and products and are thus in direct competition with each other.  *See Brennan's, Inc. v. Brennan's Rest., L.L.C.*, 360 F.3d 125, 134 (2d Cir. 2004); Compl. ¶¶ 1-12, 17-18, 21-31, 52-53; Exs. 3 & 4.  1-800 Contacts and Warby also rely on many of the same advertising mechanisms to draw customers to their websites.  *See id.* ¶¶ 17, 56-59, Exs. 2 & 8; Def. Mot. at 3.  Additionally, the parties operate in the same geographic areas, namely nationwide and online, establishing close geographic proximity.  Compl. ¶¶ 17, 21-31, 52-53; Answer ¶ 52; Def. Mot. at 3; *see Joules Ltd. v. Macy's Merch. Grp., Inc.*, 695 F. App'x 633, 637 (2d Cir. 2017) (finding competitive-proximity factor weighed in plaintiff's favor in part because the parties' products were "sold online through the parties' respective websites").  For these reasons, this factor weighs heavily in 1-800 Contacts' favor.

### 4.  *Warby's Bad Faith Use of the 1-800 CONTACTS Marks*

Fourth, Warby acted in bad faith.  The bad faith factor "concerns whether the defendant adopted its mark with the intention of capitalizing on the plaintiff's reputation and goodwill and any confusion between his and the senior user's product." *Cadbury Beverages*, 73 F.3d at 482-83 (citation and brackets omitted).  In its Complaint, 1-800 Contacts plausibly—and extensively—alleges that Warby did exactly that.  *See* Compl. ¶¶ 3-12, 66, 72, 83, 88, 96, 99, 106, 117.

1-800 Contacts alleges—and Warby admits—that Warby started bidding on the 1-800 CONTACTS Marks contemporaneously with its entry into the contact lens market, which establishes Warby's (1) awareness of 1-800 Contacts and the 1-800 CONTACTS Marks when

14

adopting use of such marks, and (2) bad faith intent to exploit the reputation and goodwill associated with the 1-800 CONTACTS Marks to increase its market share by confusing consumers. *Id.* ¶¶ 5-12, 52-56; Def. Mot. at 3. The Complaint further alleges that, although consumers who use the 1-800 CONTACTS Marks as search terms intend to navigate to 1-800 Contacts' website, Warby intentionally co-opted those search terms using source-ambiguous advertisements at or near the top of Google search results to misdirect consumers to its own Deep Linked Ad Page, which it designed to mimic 1-800 Contacts' homepage.[9] *See* Compl. ¶¶ 3-12, 55-60, 63-83; *see also* note 2, *supra*.[10] Further bad faith is plausibly alleged in Warby's keyword bidding on the 1800contacts.com domain name, from which the only reasonable inference is that Warby intends to confuse consumers who seek to reach 1-800 Contacts' website and enter the actual domain name in their search. Compl. ¶¶ 65, 80-82, Ex. 8. And Warby admits that it uses the 1-800 CONTACTS Marks to "promote" and "facilitate the sale of contact lenses." Answer ¶¶ 55-57. Thus, this factor too plainly weighs in 1-800 Contacts' favor.

### 5. *Actual Confusion*

Fifth, 1-800 Contacts has adequately alleged that Warby's conduct has resulted in actual confusion. "It is black letter law that actual confusion need not be shown to prevail under the

---

[9] Warby attaches purported "relevant portions" of its branding guidelines to its Answer to argue that its imitation of 1-800 Contacts' website comports with Warby's branding guidelines. Answer ¶ 76 (citing Ex. E (containing only 4 out of 72 pages of document entitled "The Warby Parker Brand Book")). Quite obviously, a document drafted—and provided only in part—by Warby authorizing its marketing department to copy 1-800 Contacts' website does not absolve it from a trademark infringement claim or otherwise mitigate the consumer confusion its search advertisements triggered by use of the 1-800 CONTACTS Marks has caused. Indeed, what even the handful of pages from the branding guidelines make clear is that Warby had many options to choose from in designing its Deep Linked Ad Page, yet it intentionally chose an option that is similar to 1-800 Contacts' website.

[10] Warby relies on *Allied Interstate LLC v. Kimmel & Silverman P.C.*, No. 12 Civ. 4204 (LTS)(SN), 2013 U.S. Dist. LEXIS 113465 (S.D.N.Y. Aug. 12, 2013) to argue that its ads minimize any likelihood of confusion. But in *Allied Interstate*, "[t]he content of Defendants' [keyword] advertis[ements] . . . facially disassociate[d] Defendants from Plaintiff's business," as defendants were "plainly soliciting complaints about Plaintiff's services and inviting searchers and visitors to Defendants' website *to consider suing the Plaintiff*." *Id*. at *17-18 (emphasis added). In contrast, here, the headlines and contents of Warby's search advertisements and Deep Linked Ad Page do not convey to consumers that Warby is adversarial to 1-800 Contacts or even expressly identify Warby.

15

Lanham Act, since actual confusion is very difficult to prove and the Act requires only a likelihood of confusion." *Savin*, 391 F.3d at 459 (internal quotation marks and brackets omitted). Nevertheless, in its Complaint, 1-800 Contacts alleges that Warby's use of the 1-800 CONTACTS Marks causes confusion, and 1-800 Contacts also alleges facts from which the *most* reasonable inference is that Warby's plan—by its very intent and design—causes actual confusion.[11] Consumers expect that 1-800 Contacts' website or affiliated links will be the initial results displayed when they specifically search for the 1-800 CONTACTS Marks, and the Complaint plausibly alleges that Warby exploits consumers' expectations by duping them into believing they have arrived at 1-800 Contacts' or an affiliate's website and are purchasing 1-800 Contacts' products. *See* Compl. ¶¶ 3-12, 55-57, 63-66, 68-69, 71-83; *see also* note 2, *supra*.

Additionally, Warby's Motion fails to recognize that 1-800 Contacts' claims include a theory of trademark infringement liability based on initial interest confusion caused by Warby's unlawful conduct. Compl. ¶¶ 6, 48. The Second Circuit, like most of its sister circuits, recognizes that infringement may be based on "initial interest confusion," which is "confusion that creates initial customer interest, even though no actual sale is finally completed as a result of the confusion." 4 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 23.6 (5th ed. 2010); *see also, e.g., Mobil Oil Corp. v. Pegasus Petroleum Corp.*, 818 F.2d 254, 260 (2d Cir. 1987) ("Such initial confusion works a sufficient trademark injury"); *see also Select*

---

[11] *See, e.g.*, Compl. ¶ 5 (alleging scheme that "exposes consumers to source-ambiguous Warby [] advertisements and a deep linked webpage that confuses consumers"); ¶ 9 (Warby's mimicry of the 1-800 Contacts website at Deep Linked Ad Page "causes consumers who view that webpage to reasonably—but mistakenly—conclude that the webpage they have reached is 1-800 Contacts" or an affiliated company); ¶ 72 ("Warby['s] [] plan intentionally deceives and confuses consumers, who have a reasonable and legitimate expectation that their searches for the well-known 1 800 CONTACTS Marks will lead them to 1-800 Contacts' website, products, and services," and "consumers are unable to determine immediately and conclusively whether or not" the Deep Linked Ad Page is affiliated with 1-800 Contacts); ¶ 90 (alleging that the totality of Warby's conduct causes 1-800 Contacts harm by "unfairly and deceptively confusing and diverting current and prospective 1-800 Contacts customers to Warby['s] [] website").

16

*Comfort Corp. v. Baxter*, 996 F.3d 925 (8th Cir. 2021) (applying initial interest confusion in keyword advertising context).

Moreover, if there is any question regarding whether 1-800 Contacts has adequately alleged actual confusion, it should be permitted to engage in fact and expert discovery.  "[P]roof of actual confusion is generally shown through consumer surveys or anecdotal evidence of confusion, or empirical studies or expert testimony." *Classic Liquor Importers, Ltd. v. Spirits Int'l B.V.*, 201 F. Supp. 3d 428, 448 (S.D.N.Y. 2016) (internal quotation marks omitted); *see also MetLife, Inc. v. Metro. Nat'l Bank*, 388 F. Supp. 2d 223, 232 (S.D.N.Y. 2005) ("A survey as to the potential consumer confusion may be weighed when considering the likelihood of confusion") (Castel, J.).  Because discovery has not yet occurred, 1-800 Contacts has not yet had occasion to pursue a consumer survey, seek documentation of actual confusion within Warby's possession,[12] or solicit empirical studies or expert testimony.  Even without discovery, however, 1-800 Contacts has alleged sufficient facts for this *Polaroid* factor to weigh in its favor.

### 6.  *Sophistication of Consumers in the Relevant Market*

Finally, 1-800 Contacts has plausibly alleged that online shoppers are confused by Warby's keyword bidding and that consumers are not sufficiently sophisticated to be impervious to Warby's unlawful plan.  "The sophistication factor recognizes that the likelihood of confusion between the products at issue depends in part on the sophistication of the relevant purchasers." *Cadbury Beverages*, 73 F.3d at 480 (internal quotation marks omitted); *see id.* at 480, 482 (finding "a sufficient dispute exists to preclude resolution as a matter of law" as to the

---

[12] Considering the nature of the alleged scheme, most evidence of actual confusion is likely to be solely within Warby's possession, because consumers confused at the Deep Linked Ad Page naturally would be more likely to report such confusion via the contact information listed on the Deep Linked Ad Page itself rather than going to 1800contacts.com to report such information there. *See* Compl., Ex. 4, Deep Linked Ad Page, at 7 (providing telephone number and "Text," "Chat," "Email," and "Call" icon links for consumers who "Need a hand?"); *see also Select Comfort*, 996 F.3d at 931, 937 (discussing similar actual confusion evidence acquired in discovery).

17

"sophistication-of-the-buyers" inquiry).  This factor "examines the amount of care and attention a consumer takes in evaluating a product before making a purchase," and "the greater the value of an article the more careful the typical consumer can be expected to be."  *Kraft Gen. Foods, Inc. v. Allied Old English, Inc.*, 831 F. Supp. 123, 133 (S.D.N.Y. 1993) (internal quotation marks and brackets omitted).  "[O]rdinary retail consumers are not assumed to spend the same amount of care as professional buyers."  *CJ Prods. LLC v. Snuggly Plushez LLC*, 809 F. Supp. 2d 127, 156 (E.D.N.Y 2011).

Here, 1-800 Contacts plausibly alleges that online shoppers are confused by Warby's deliberate plan of keyword bidding on the 1-800 CONTACTS Marks, which leads to source-ambiguous, sponsored search engine ads that misdirect consumers to Warby's Deep Linked Ad Page.  *See, e.g.*, Compl. ¶¶ 5-11, 61-66, 72, 80-86, 90.[13]  And contrary to Warby's assertions, neither the label "Ad," nor the inclusion of the term "warbyparker" in the URL (both of which appear in a smaller font and less prominent color than the ad headline and content) affects the plausibility of 1-800 Contacts' allegations.[14]  Compl. ¶¶ 58-62, Exs. 2 & 8.

Furthermore, any dispute about consumer sophistication poses a quintessential factual dispute properly left to a jury.  *See Cadbury Beverages*, 73 F.3d at 480-82; *Select Comfort*, 996 F.3d at 935-38; *Rosetta Stone. Ltd. v. Google, Inc.*, 676 F.3d 144, 159-60 (4th Cir. 2012).  It is well-established that "[c]onsumer sophistication may be proved by direct evidence such as expert

---

[13] The fact that keyword bids by a party for a competitor's trademarks comprise a low percentage of sponsored ads and are "distinctly unrepresentative of the universe of transactions in which keywords are purchased" further evidences that consumers are not sufficiently familiar with this scenario to avoid confusion.  Hyman & Franklyn, 92 TEX. L. REV. at 2146.

[14] "Many consumers who scan the search results, particularly on a mobile device that displays fewer search results on the initial search engine results page, will focus on the larger, brighter-colored, and more conspicuous ad headline and content and not notice the smaller, black domain name text."  Compl. ¶ 61.  And the small "Ad" designation does not serve to distinguish the ad's source, as such designation is identical to that used in 1-800 Contacts' own paid search advertisements for the 1-800 CONTACTS Marks.  *See id.* ¶¶ 84, 87, Exs. 2 & 8.

18

opinions or surveys." *Star Indus.*, 412 F.3d at 390; *see also Rosetta Stone*, 676 F.3d at 159-60; *Select Comfort*, 996 F.3d at 935-37 (finding a factual dispute as to "whether . . . online shoppers should be deemed careful, sophisticated consumers").

*     *     *

Based on the foregoing application of the *Polaroid* factors, 1-800 Contacts has more than plausibly alleged a likelihood of confusion, and Warby's Motion should therefore be denied.

## II.  WARBY'S ARGUMENTS THAT 1-800 CONTACTS HAS NOT SUFFICIENTLY PLED LIKELIHOOD OF CONFUSION FAIL.

Rather than address the *Polaroid* likelihood-of-confusion factors (or even cite *Polaroid*), Warby attempts to impose baseless, heightened pleading standards on trademark infringement claims arising in the keyword bidding context.  These flawed contentions should be rejected.

### A.  No Heightened Lanham Act Pleading Standard Exists for Claims Based on Search Engine Keyword Bidding.

Purportedly relying on the Second Circuit's decisions in *Rescuecom* and *Savin*, Warby contends that, for 1-800 Contacts' claims to survive, it must "plead . . . more than just allegations establishing Warby['s] [] keyword advertising" and must specifically show "intentional deception."  Def. Mot. at 1-2, 8-9.  That is not the law.

### 1.  *Warby Is Wrong That 1-800 Contacts Must Plead "More" Than Warby's Bidding on 1-800 Contacts as a Keyword and Displaying Search Advertisements to Show Likelihood of Confusion*

Warby's contention that, under *Rescuecom,* something "more than" bidding on a competitor's keyword must be alleged to establish likelihood of confusion is incorrect.  The plaintiff in *Rescuecom* sued Google for selling keywords for the plaintiff's trademarks in Google's AdWords program and subsequently displaying advertisements of plaintiff's competitors in response to consumer searches for plaintiff's trademarks.  562 F.3d at 125-27. After the Second Circuit held that this conduct constituted "use in commerce" within the

19

meaning of the Lanham Act, the court noted that bidding on a competitor's trademark can result in a search engine displaying an advertisement that is likely to confuse consumers. In so doing, the court explained that such confusion can occur because consumers who search for a retailer's brand name expect the initial links to take them to the brand owner's website or to otherwise be affiliated with the brand owner. *See id.* at 130-31. Accordingly, the Second Circuit observed that the mere display of advertisements in a position where consumers expect to see a link to the brand owner's website can plausibly be confusing and sustain a claim for trademark infringement. *See id.* That is plainly one of the things 1-800 Contacts alleges is occurring here. *See, e.g.*, Compl. ¶¶ 5-11, 61-66, 72, 80-86, 90.

Despite *Rescuecom*, Warby claims that "[v]irtually no court has held that, on its own, a defendant's purchase of a plaintiff's mark as a keyword term is sufficient for liability." Def. Mot. at 9 (citing *Kid Car*, 518 F. Supp. 3d at 759) (quotation marks omitted) (quoting *Alzheimer's*, 307 F. Supp. 3d at 283-84). But 1-800 Contacts does not contend—or allege—that a defendant's keyword bidding *automatically* establishes trademark infringement liability. Rather, 1-800 Contacts' position is that, under *Rescuecom* and its progeny, plausible allegations of a defendant's keyword bidding on a plaintiff's trademark require a likelihood of confusion analysis under the fact-intensive *Polaroid* test. *Rescuecom*, 562 F.3d at 130. And, as set forth above, 1-800 Contacts' Complaint more than plausibly alleges likelihood of confusion under the *Polaroid* factors.[15]

---

[15] Warby's reliance on a number of cases from outside this Circuit is misplaced. In *Infostream Group Inc. v. Avid Life Media Inc.*, No. CV 12-09315 DDP, 2013 U.S. Dist. LEXIS 161940 (C.D. Cal. Nov. 12, 2013), the court dismissed trademark infringement claims because such claims would be "better addressed in the first-filed related action." *Id.* at *8. The remaining claims involved keyword advertisements with a significantly different format than the 2021 Google search results alleged in the Complaint. In *Infostream*, the ads were segregated by being displayed "to the right of the search term result," whereas 1-800 Contacts alleges that Warby's ads appear at or near the top of the search results and are not segregated or conspicuously delineated from the natural search results. *Id.* at *12; Compl. ¶¶ 38, 58, 81, Exs. 2 & 8. Moreover, unlike the Deep Linked Ad Page, the landing webpages in *Infostream*

20

Finally, 1-800 Contacts has adequately pled facts alleging that Warby did far more than simply bid on the 1-800 CONTACTS Marks as keywords. *See*, *supra* at 11-19. Accordingly, the Court need not decide whether or how much "more" is required.

### 2. *Warby Is Wrong That Plaintiffs Are Required to Show Intentional Deception In Trademark Infringement Cases*

Warby is also incorrect in asserting that the Second Circuit's opinions in *Rescuecom* and *Savin* require a plaintiff to allege that the defendant engaged in "intentional deception" or a "deceptive plan" to plead a claim of trademark infringement in the keyword bidding context.

Notably, *Rescuecom* refers to a "deceptive plan" only in the context of illustrating how a defense of "product placement" does not create a "shield against liability, so that even a deceptive plan of product placement designed to confuse consumers would similarly escape liability." 562 F.3d at 130. The *Rescuecom* court proceeded to explain that, in the keywording bidding context, once use in commerce is established, the inquiry becomes whether or not the unauthorized use causes a "likelihood of consumer confusion," just as in any other trademark infringement case. *Id.* at 130-31. Of course, bad faith is only one of several *Polaroid* factors, and is not in itself dispositive. *See supra* at 14-16. Simply stated, *Rescuecom* in no way established deception as an independent, necessary element of trademark infringement. *See id.*

---

did not mimic the look and feel of the plaintiff's website, and, unlike the 1-800 CONTACTS Marks, the plaintiff's trademarks and websites in *Infostream* were not well-known. Finally, the remaining cases cited by Warby are easily distinguishable from the allegations in the Complaint. *See Boost Beauty LLC v. Woo Signatures, LLC*, 2:18-cv-02960, 2018 U.S. Dist. LEXIS 227156 (C.D. Cal. July 23, 2018) (dismissing case because defendant did not bid on plaintiff's trademarks, thus there was no "use" of plaintiff's mark); *Novation Ventures, LLC v. J.G. Wentworth Co.*, CV 15-00954, 2015 U.S. Dist. LEXIS 188001 (C.D. Cal. Sept. 21, 2015) (plaintiff did not allege "use" by defendant of plaintiff's mark, but rather that defendant used *defendant's* own mark to consistently garner top positions in search results for the services at issue, thus failing to allege the Lanham Act "use" requirement); *J.G. Wentworth, S.S.C. Ltd. P'ship v. Settlement Funding LLC*, No. 06-0597, 2007 U.S. Dist. LEXIS 288 (E.D. Pa. Jan. 4, 2007) (decided pre-*Rescuecom* and involving Google search results apparently formatted differently than those alleged in this case, and lacking allegations of a deep-linked ad page exacerbating consumer confusion).

Similarly, contrary to Warby's assertions, in *Savin*, the Second Circuit did not create a standalone deception element. Rather—on a full summary judgment record—the *Savin* court remarked (in dicta, since this was not at issue on the appeal) when describing the district court's weighing of a particular likelihood of confusion factor, that intentional deception was but one relevant factor to the consideration of a claim of initial interest confusion on the Internet. 391 F.3d at 462 n.13. Indeed, the cases *Savin* cites for this proposition likewise treat intentional deception as just one of many factors in the likelihood of confusion analysis. *See BigStar Ent., Inc. v. Next Big Star, Inc.*, 105 F. Supp. 2d 185, 207 (S.D.N.Y. 2000); *Bihari v. Gross*, 119 F. Supp. 2d 309, 319 (S.D.N.Y. 2000).

Finally, even if "intentional deception" were a required element, 1-800 Contacts has pled it. *See*, *supra* at 14-16. Because evidence of state of mind is peculiarly within the possession of the defendant, Rule 9(b) of the Federal Rules of Civil Procedure permits plaintiffs to satisfy the pleading standard by making allegations of intent generally, and 1-800 Contacts has done far more. Among other things, 1-800 Contacts alleges that Warby—a new entrant to the contact lens market—intentionally designed and implemented an improper plan to use the 1-800 CONTACTS Marks to trigger source-ambiguous search advertisements to confuse consumers. 1-800 Contacts also alleges that Warby compounds this confusion by linking those advertisements to a webpage that copies the color and formatting of 1-800 Contacts' website. At the pleading stage, this is more than sufficient factual support to allege Warby's intentional consumer deception.

## B. No Obligation to Assert an Independent Trade Dress Infringement Claim Exists in Order for Warby's Imitation of 1-800 Contacts' Website to be Relevant.

Warby does not dispute that its Deep Linked Ad Page mimics the format and coloring of 1-800 Contacts' website or that Warby specifically designed the Deep Linked Ad Page in an

22

effort to confuse and deceive consumers.  However, Warby argues that its intentional imitation of 1-800 Contacts' website is irrelevant because 1-800 Contacts has not asserted a trade dress infringement claim in this action.  Def. Mot. at 13-16.  Once again, Warby is incorrect.

As an initial matter, Warby cites no authority for its position, because there is none. Ample authority supports the proposition that the formatting and coloring of Warby's webpages appropriately factor into the *Polaroid* analysis for 1-800 Contacts' trademark infringement and unfair competition claims even in the absence of a claim for trade dress infringement.  Indeed, courts in this Circuit routinely consider evidence of similarities between the parties' non-protectible website and product designs in trademark infringement cases in which neither trade dress rights nor trade dress infringement claims are successfully asserted.  For example, in *Caraway Home*, the court denied a motion to dismiss trademark infringement and unfair competition claims premised on defendant's keyword bidding for plaintiff's marks based in part on plaintiff's allegations that "third parties have considered [plaintiff's goods] and [defendant's goods] to be 'almost identical'" in appearance, despite granting a motion to dismiss trade dress infringement claims based on the appearance of those same goods.  2021 U.S. Dist. LEXIS 64364, at *25, 27-28; *see also, e.g.*, *Maternally Yours*, 234 F.2d at 543 (finding similarities of non-protectible format and font of the parties' advertising and similarities in product packaging contributed to likelihood of consumer confusion in trademark infringement analysis); *Hearts on Fire Co. v. Blue Nile, Inc.*, 603 F. Supp. 2d 274, 289 (D. Mass. 2009) (considering "downstream content" on linked webpage).

Moreover, in the instant case, even without a claim for trade dress infringement, the coloring and formatting of the Deep Linked Ad Page is highly relevant to 1-800 Contacts' claims under the *Polaroid* test.  For instance, 1-800 Contacts' allegations regarding Warby's imitation

23

of the format and color arrangement of 1-800 Contacts' website underscores the strength, goodwill, and favorable reputation the 1-800 CONTACTS Marks have developed in the eyes of consumers.  Compl. ¶¶ 7, 9, 66-79, 83, 87-90.[16]  Warby's imitation of 1-800 Contacts' website also concerns the identical marks used by the parties, as it is beyond dispute that the confusion between ads leading to Warby's Deep Linked Ad Page and ads and search results leading to 1-800 Contacts' website is compounded when Warby designs its Deep Linked Ad Page to look and feel vastly different from its homepage and main pages and instead "us[es] the same color, format . . .  and phrases" displayed on 1-800 Contacts' website.  *CJ Prods.*, 809 F. Supp. 2d at 159; *see also Cadbury Beverages*, 73 F.3d at 480 (finding that defendants' use of "the same large script print that plaintiff has historically used" supports plaintiff on the similarity-of-the-marks factor).

Finally, Warby's imitation of 1-800 Contacts' website demonstrates bad faith because the similarities between the 1800contacts.com website and the Deep Linked Ad Page are extremely unlikely to have resulted from mere happenstance.  Instead, the most reasonable—and most plausible—inference from the factual allegations regarding the similarities in format and color arrangement between 1800contacts.com and the Deep Linked Ad Page (similarities that appear nowhere else on Warby's website) is that Warby intentionally designed the Deep Linked Ad Page as part of its overall scheme to confuse consumers as to the source of the Deep Linked Ad Page and to intentionally exploit the favorable reputation consumers associate with the source of the 1-800 CONTACTS Marks.  *See, e.g.*, Compl. ¶¶ 5, 7, 9-12, 66-79, 89-90, Exs. 2-5 & 7.

---

[16] A competitor would mimic 1-800 Contacts' website only if it viewed the 1-800 CONTACTS Marks as sufficiently strong such that creating a false association with 1-800 Contacts would be profitable.  *See, e.g.*, *N.Y. State Soc'y of Certified Pub. Accts. v. Eric Louis Assocs., Inc.*, 79 F. Supp. 2d 331, 341 (S.D.N.Y. 1999).

In sum, the fact that the 1-800 Contacts' Complaint does not assert a trade dress infringement claim based on Warby's imitation of its website is simply irrelevant to the likelihood-of-confusion analysis and Warby's argument should be rejected.

## CONCLUSION

For the forgoing reasons, Warby's Motion for Judgment on the Pleadings should be denied.

Dated: January 10, 2022

Respectfully submitted,

/s/ *Stephen R. Fishbein*
Stephen R. Fishbein
sfishbein@shearman.com
Susan Loeb
susan.loeb@shearman.com
SHEARMAN & STERLING LLP
599 Lexington Avenue
New York, NY 10022
Tel: (212) 848-4424

Todd M. Stenerson
todd.stenerson@shearman.com
Ryan A. Shores
ryan.shores@shearman.com
Brian C. Hauser
(*pro hac vice application forthcoming*)
brian.hauser@shearman.com
SHEARMAN & STERLING LLP
401 9th Street NW
Washington, DC 20004
Tel: (202) 508-8093

Steven J. Joffee
*(admitted pro hac vice)*
sjoffee@michaelbest.com
Jeffrey H. Brown
*(admitted pro hac vice)*
jhbrown@michaelbest.com
Thomas A. Agnello
*(admitted pro hac vice)*
taagnello@michaelbest.com

25

MICHAEL BEST & FRIEDRICH LLP
170 South Main Street, Suite 1000
Salt Lake City, Utah 84101
Tel: (385) 695-6450 Fax: (801) 931-2500

***Attorneys for Plaintiff,***
***1-800 Contacts, Inc.***