UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x

1-800 CONTACTS, INC.,

                        Plaintiff,

                                                                      21-cv-6966 (PKC)

      -against-

                                                      OPINION AND ORDER

JAND, INC. d/b/a WARBY PARKER,

                        Defendant.

-----------------------------------------------------------x

CASTEL, U.S.D.J.

        Plaintiff 1-800 Contacts, Inc. ("1-800 Contacts") is an online retailer of contact lenses. Defendant JAND, Inc., doing business as Warby Parker ("Warby Parker"), is an online and physical retailer of eyeglasses and a recent entrant into the online contact lens marketplace. As against Warby Parker, 1-800 Contacts now brings claims of trademark infringement and unfair competition under both New York common law and the Lanham Act. 15 U.S.C. §§ 1114, 1125(a).

        1-800 Contacts primarily alleges that Warby Parker, as part of its recent foray into the online contact lens market, has sought to confuse and mislead consumers searching for 1-800 Contacts's online store, 1800contacts.com. Specifically, 1-800 Contacts alleges that Warby Parker bids for advertisements on search engine results for trademarks belonging to 1-800 Contacts, such that when a consumer conducts an online search for "1800 contacts" or other trademarks belonging to 1-800 Contacts, the search results page will display a paid search result for Warby Parker's website at, or near the top of the results page, often above the search results linking to the actual 1-800 Contacts website. 1-800 Contacts alleges that the paid search result,

labeled as an "Ad" and displaying Warby Parker's website address, directs the consumer instead to a specific "deep-linked" landing page for contact lenses on Warby Parker's website, which allegedly mimics 1-800 Contacts's website and causes consumer confusion as to whether the contact lenses sold on Warby Parker's website are related to 1-800 Contacts, thus inflating Warby Parker's online contact lens sales at the cost of 1-800 Contacts. After filing its answer, Warby Parker now moves under Rule 12(c), Fed. R. Civ. P., for dismissal of all claims brought by 1-800 Contacts and judgment on the pleadings in Warby Parker's favor. (Doc 34.)

As will be explained, in viewing the Complaint's factual allegations in the light most favorable to non-movant 1-800 Contacts and through an analytical lens drawing all reasonable inferences in favor of 1-800 Contacts, the Court concludes that 1-800 Contacts has failed to plausibly plead a claim for relief as to its claims for trademark infringement and unfair competition under both federal and New York common law. Warby Parker's motion for judgment on the pleadings will be granted.

BACKGROUND

The Court summarizes the complaint's factual allegations, and, for the purposes of the motion, accepts them as true, drawing all reasonable factual inferences in favor of the plaintiffs as the non-movants. See Eastman Kodak Co. v. Henry Bath LLC, 936 F.3d 86, 93 (2d Cir. 2019) (noting that a motion to dismiss pursuant to Rule 12(c), Fed. R. Civ. P. is governed by the same standards as a motion to dismiss pursuant to Rule 12(b)(6), Fed. R. Civ. P.); In re Hain Celestial Grp., Inc. Sec. Litig., 20 F.4th 131, 133 (2d Cir. 2021) (laying out the standard for a motion to dismiss pursuant to Rule 12(b)(6), Fed. R. Civ. P.).

Over the past three decades, 1-800 Contacts, a "well-known pioneer" in the online contact lens marketplace, has spent hundreds of millions of dollars on advertising and marketing

to cultivate strong consumer recognition of its brand, services and trademarks. (Compl. ¶ 1.) Because 1-800 Contacts is an online, rather than a brick-and-mortar retailer of contact lenses, consumers reach 1-800 Contacts through its website, 1800contacts.com. (Id. ¶ 3.) In trying to navigate to 1-800 Contacts's website, many consumers conduct online searches for terms such as "1800 Contacts," "1 800 Contacts," "1800contacts.com" and "1800contacts," which are trademarks belonging to 1-800 Contacts (the "1-800 Contacts Marks"). (Id. ¶¶ 3, 22.) 1-800 Contacts currently serves millions of customers—for example, between June 1, 2020 and June 30, 2021, 1-800 Contacts's website averaged more than 1.5 million unique monthly visitors. (Id. ¶ 2.)

At issue in this case is a method of internet advertising called "search advertising," which involves advertisers' bidding on keywords that generate paid search results in auctions hosted by the search engines. (Id. ¶ 32.) When online shoppers use a search engine such as Google or Microsoft Bing to search for terms related to 1-800 Contacts—such as the 1-800 Contacts Marks—the search engine returns "two main types of search results: (1) sponsored, or paid, search results, and (2) organic, or natural, search results. Both sponsored and organic search results provide links to webpages." (Id. ¶ 32.) When a consumer conducts a search, the paid advertisements appear either at, or near the top of the search results, accompanied by a small designation signaling that they are an "Ad." (Id. ¶ 38.)

Warby Parker, a company recognized for selling eyeglasses, is a relatively new entrant in the online contact lens marketplace, having begun selling contact lenses nationwide through its warbyparker.com website and its physical stores around November 2019. (Id. ¶¶ 5, 18, 49, 50.) Warby Parker uses the trade name and trademark "Warby Parker" in connection with online and retail sales of eyeglasses, sunglasses, and more recently, contact lenses. (Id.

¶ 51.) As part of its marketing efforts, Warby Parker bids on search engine keywords that include the 1-800 Contacts Marks, such that the search engine keywords generate results pages with advertisements linking to Warby Parker's own website at or near the top of the results page. (Id. ¶ 5.) The Warby Parker advertisements are labeled "Ad," and also list the website https://www.warbyparker.com/ next to the "Ad" label. (Id. ¶¶ 58-59, 61, Ex. 3)

1-800 Contacts alleges that upon clicking on such advertisements bought by Warby Parker, consumers who conducted a search using one of the 1-800 Contacts Marks are instead sent to the Warby Parker website's landing page for contact lenses, which "deceptively and intentionally mimics the look and feel of 1-800 Contacts' website, including through use of a confusingly similar color scheme, layout, and discount offering, along with imagery evoking the 1800contacts.com website," such as by using a "familiar light blue colored background displaying representative contact lens products and a discount offer, just like that found at 1800contacts.com." (Id. ¶¶ 7, 10.)

1-800 Contacts also alleges that Warby Parker purchases advertising search results such that consumers searching for "Warby Parker contacts" are led to paid searches linking to a different landing page at warbyparker.com from those consumers searching for the 1-800 Contacts Marks. Allegedly, the landing page provided to consumers searching for "Warby Parker contacts" appears distinctively different from the landing page provided to consumers searching for the 1-800 Contacts Marks. The former "replicates the look and feel of the WarbyParker.com homepage and other pages at WarbyParker.com" in contrast to the landing

page for searches with the 1-800 Contacts Marks, which appears to intentionally mimic the look and feel of the 1-800 Contacts website instead.  (Id. ¶¶ 7, 73-79.)

   1-800 Contacts alleges that it has spent substantial sums to outbid Warby Parker on paid search results to combat the perceived likelihood of consumer confusion caused by Warby Parker's bidding on paid searches for the 1-800 Contacts Marks.  (Id. ¶ 84.)  Despite its efforts, however, 1-800 Contacts has not always succeeded in securing "the critical top search result position" for searches performed for the 1-800 Contacts Marks, as Warby Parker's ads often appear above both the paid and natural search results linking to 1-800 Contacts's own website, 1800contacts.com.  (Id. ¶ 86.)

   1-800 Contacts alleges that Warby Parker's conduct therefore "diverts a material number of customers who expected to be taken to 1-800 Contacts' website," to Warby Parker's own website, which they either "reasonably believe to be affiliated with 1-800 Contacts," or belatedly realize is not 1800contacts.com, resulting in the inflation of Warby Parker's online contact lens sales and 1-800 Contacts's advertising costs.  (Id. ¶ 12.)

RULE 12(C) STANDARD

   Rule 12(c) states that "[a]fter the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings."  Rule 12(c), Fed. R. Civ. P.  A motion to dismiss pursuant to Rule 12(c) is governed by the same standards as a motion to dismiss pursuant to Rule 12(b)(6), Fed. R. Civ. P.  Eastman Kodak Co. v. Henry Bath LLC, 936 F.3d 86, 93 (2d Cir. 2019).

   To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550

U.S. 544, 570 (2007)).  Legal conclusions are not entitled to the presumption of truth, and a court assessing the sufficiency of a complaint disregards them.  Iqbal, 556 U.S. at 678.  Instead, the Court must examine only the well-pleaded factual allegations, if any, "and then determine whether they plausibly give rise to an entitlement to relief."  Id. at 679.  A complaint must include non-conclusory factual allegations that "'nudge[]'" its claims "'across the line from conceivable to plausible.'"  Id. at 680 (quoting Twombly, 550 U.S. at 570).

DISCUSSION

    A.    Federal Trademark Infringement and Unfair Competition Claims

The Court concludes that 1-800 Contacts has failed to plausibly plead a claim for relief as to its federal trademark infringement and unfair competition claims.

    i.    Applicable Law

"To prevail on a trademark infringement and unfair competition claim under 15 U.S.C. §§ 1114(1), 1125(a)," the plaintiff must (1) demonstrate that its mark is protected, and (2) "that the defendant's use of the allegedly infringing mark would likely cause confusion as to the origin or sponsorship of the defendant's goods with plaintiff's goods."  Starbucks Corp. v. Wolfe's Borough Coffee, Inc., 588 F.3d 97, 114 (2d Cir. 2009).  As relevant here, purchasing a competitor's trademark in relation to keyword advertising counts as a "use in commerce" of the competitor's trademark under the Lanham Act.  Rescuecom Corp. v. Google Inc., 562 F.3d 123, 127 (2d Cir. 2009).

"In determining whether there is a likelihood of confusion, [courts] apply the eight-factor balancing test introduced in Polaroid Corp. v. Polarad Elecs. Corp., 287 F.2d 392 (2d Cir. 1961)."  Starbucks, 588 F.3d at 115.  "The eight factors are: (1) strength of the trademark; (2) similarity of the marks; (3) proximity of the products and their competitiveness with one

another; (4) evidence that the senior user may 'bridge the gap' by developing a product for sale in the market of the alleged infringer's product; (5) evidence of actual consumer confusion; (6) evidence that the imitative mark was adopted in bad faith; (7) respective quality of the products; and (8) sophistication of consumers in the relevant market." Id. (citing Star Indus., Inc. v. Bacardi & Co. Ltd., 412 F.3d 373, 384 (2d Cir. 2005)).

   ii.  Application

The parties do not dispute that the 1-800 Contacts Marks are protected, nor do they dispute that Warby Parker's bids for search term advertising involving the 1-800 Contacts Marks qualify as "use" for the purposes of pleading trademark infringement and unfair competition under the Lanham Act. Rescuecom, 562 F.3d at 127. The primary issue before the Court is whether 1-800 Contacts has plausibly pled that Warby Parker's use of the 1-800 Contacts Marks, through search term advertising and the linking of a particular landing page on Warby Parker's website, would likely cause confusion as to the origin or sponsorship of Warby Parker's goods with 1-800 Contacts's goods. See Starbucks, 588 F.3d at 115.

The Polaroid test for determining the likelihood of consumer confusion "is a fact-intensive inquiry that depends greatly on the particulars of each case," and no single factor is determinative. Kelly-Brown v. Winfrey, 717 F.3d 295, 307 (2d Cir. 2013). "The application of the Polaroid test is 'not mechanical, but rather, focuses on the ultimate question of whether, looking at the products in their totality, consumers are likely to be confused.'" Starbucks, 588 F.3d at 115. Here, the Court focuses on: (1) the strength of the 1-800 Contacts Marks; (2) the degree of similarity of the marks at issue; (3) the proximity, competitiveness and relative quality of the products sold by the parties; (4) alleged evidence of bad faith by Warby Parker; and (5) the sophistication of consumers in the relevant market. As to the other Polaroid factors, the Court

concludes that "the 'bridging the gap' factor is irrelevant . . . where, as here, the two products are in direct competition with each other," Starbucks, 588 F.3d at 115 (citing Star Indus., 412 F.3d at 387), and concludes that it lacks sufficient information to reach a meaningful conclusion as to the "actual confusion" factor.[1]

### a. Strength of the Marks

First, as to the strength of the 1-800 Contacts Marks, the Court concludes, based on the Complaint's factual allegations, that the 1-800 Contacts Marks are strong. "There are two components of a mark's strength: its inherent distinctiveness and the distinctiveness it has acquired in the marketplace." Brennan's, Inc. v. Brennan's Restaurant, L.L.C., 360 F.3d 125, 130-31 (2d Cir. 2004) (citing Streetwise Maps, Inc. v. VanDam, Inc., 159 F.3d 739, 743-44 (2d Cir. 1998)). Inherent distinctiveness examines a mark's "theoretical potential to identify plaintiff's goods or services without regard to whether it has actually done so," and courts "assess inherent distinctiveness by classifying a mark in one of four categories arranged in increasing order of inherent distinctiveness: (a) generic, (b) descriptive, (c) suggestive, or (d) fanciful or arbitrary." Id. As to the distinctiveness acquired in the marketplace, "[i]f a mark has been long, prominently and notoriously used in commerce, there is a high likelihood that consumers will recognize it from its prior use." Virgin Enters. Ltd. v. Nawab, 335 F.3d 141, 148 (2d Cir. 2003).

Although 1-800 Contacts argues that its marks are "presumed to be strong by virtue of being registered," the required analysis is more complex. It is true that neither party

---

[1] There is no evidence in the Complaint of "actual confusion"—such as customer reviews confusing contacts bought from 1-800 Contacts with contacts bought online from Warby Parker—but rather, factual allegations from which plaintiff infers that there is a likelihood of confusion. Of course, plaintiff need not allege actual confusion to state a claim under the Lanham Act. See Starbucks, 588 F.3d at 117 (noting that "actual confusion is not necessary to establish a likelihood of confusion" (citing Hasbro, Inc. v. Lanard Toys, Ltd., 858 F.2d 70, 78 (2d Cir. 1988)).

disputes the protectability of the marks and that registration of a trademark can trigger a presumption of strength, specifically, of being "more than merely descriptive," if the U.S. Patent and Trademark Office ("USPTO") registered the mark without proof of secondary meaning. See, e.g., Joules Limited v. Macy's Merchandising Grp., Inc., 695 Fed. App'x 633, 638 (2d Cir. 2017) (summary order) (quoting Lane Cap. Mgmt., Inc. v. Lane Cap. Mgmt., Inc., 192 F.3d 337, 345 (2d Cir. 1999)). But here, the pleadings do not address the registration process of the marks at issue and whether the USPTO required proof of secondary meaning. Indeed, even a registered and uncontested mark can still be deemed "inherently weak" depending on the context. See Brennan's, 360 F.3d at 132. See also Windsor, Inc. v. Intravco Travel Ctrs., Inc., 799 F. Supp. 1513, 1521 (S.D.N.Y. 1992) ("Although a registered mark is presumptively distinctive, its registration does not necessarily mean the mark is strong.").

Instead, the Court concludes, based on the language of the 1-800 Contacts Marks, that the marks are suggestive. The marks are not generic because "1-800 Contacts," while referring to "contacts," does not "refer[ ] . . . to the genus of which the particular product is a species," and instead takes the form of a toll-free number, whose last seven digits spell out "contacts." Abercrombie & Fitch Co. v. Hunting World, Inc., 537 F.2d 4, 9 (2d Cir. 1976). Similarly, the marks are not "descriptive," because "1-800 Contacts" does not say "something about a product, its qualities, ingredients, or characteristics." Gruner + Jahr USA Pub., a Div. of Gruner + Jahr Printing and Pub. Co. v. Meredith Corp., 991 F.2d 1072, 1076 (2d Cir. 1993). Rather, the 1-800 Contacts marks are suggestive because it "suggests the product, though it may take imagination to grasp the nature of the product." Id. "[A]lthough it may take some imagination to grasp that what Plaintiff markets is contact lenses (as opposed to electrical contacts or business contacts), the mark suggests Plaintiff's product." 1-800 Contacts, Inc. v.

9

WhenU.com, 309 F. Supp. 2d 467, 496 (S.D.N.Y. 2003) (Batts, J.), *rev'd on other grounds*, 1-800 Contacts, Inc. v. WhenU.com, Inc., 414 F.3d 400 (2d Cir. 2005).  The Court therefore concludes that the 1-800 Contacts Marks possess inherent distinctiveness.

The court also concludes that the marks have acquired distinctiveness from the marketplace.  Based on the Complaint's factual allegations, such as the almost three decades of business activity involving the 1-800 Contacts Marks, hundreds of millions of dollars spent on developing the 1-800 Contacts brand and reputation and the millions of visitors to the 1-800 Contacts website, the Court concludes that the 1-800 Contacts Marks have been "long, prominently and notoriously used in commerce," and that there is a "high likelihood that consumers will recognize" the marks from their prior use.  Virgin, 335 F.3d at 148.

Accordingly, the Court concludes that the 1-800 Contacts Marks, which possess both inherent distinctiveness and distinctiveness acquired from the marketplace, are strong marks.

          b.        Similarity of the Marks

Second, as to the similarity of the marks, the Court concludes that the marks at issue are substantially different.  Although 1-800 Contacts submits that "the marks used by the parties are identical" because Warby Parker and 1-800 Contacts are both using the 1-800 Contacts Marks, this is not the relevant analysis for determining the likelihood of consumer confusion in the context of search term advertising.  While Warby Parker "uses" the 1-800 Contacts Marks by bidding on search results for the marks, the crux of 1-800 Contacts's claims here is that after the search results for the 1-800 Contacts Marks are displayed to the consumer, there is an appreciable number of consumers who cannot discern, either before or after clicking

on the paid links to Warby Parker's website, that the contacts being sold by Warby Parker on their website are actually unrelated to 1-800 Contacts or the 1800contacts.com website.

In this context, the marks to be compared are the 1-800 Contacts Marks and the "Warby Parker" mark.  In so comparing, the Court notes that the 1-800 Contacts Marks at issue are all variants of "1-800 Contacts," presented in the format of a toll-free number emphasizing one specific product: contact lenses.  In contrast, "Warby Parker" lacks any references to a phone number (or numbers generally) or a specific product.  Finally, as the parties themselves note, 1-800 Contacts is strongly associated with only contact lenses, while Warby Parker is strongly associated with eyewear, such as eyeglasses and sunglasses.  The "History" page of the Warby Parker website, cited in the Complaint also emphasizes Warby Parker's sale of eyewear. (Compl. ¶ 49.)

      c. <u>Proximity, Competitiveness and Relative Quality of the Products</u>

Third, as to the proximity of the products at issue. their competitiveness with one another, and their relative quality, the parties do not dispute, and the Court concludes that the parties' products are virtually identical and are in direct competition with another—as relevant to this dispute over online search advertising, both 1-800 Contacts and Warby Parker are selling contact lenses to consumers online.

      d. <u>Bad Faith</u>

Fourth, as to the issue of bad faith, the Court concludes that, at the pleadings stage, accepting the Complaint's factual allegations as true and drawing all reasonable inferences in favor of 1-800 Contacts, that there is some evidence of bad faith by Warby Parker.  Notably, 1-800 Contacts alleges that Warby Parker provided links to a different landing page in its paid results for searches conducted using the 1-800 Contacts Marks.  In other words, the Complaint

alleges that consumers who searched for terms like "Warby Parker contacts" would be directed to a page on the Warby Parker website that matched the overall aesthetics of the rest of Warby Parker's website. In contrast, Warby Parker intentionally directed consumers who were searching for 1-800 Contacts's website to an altered page on the Warby Parker website that plaintiff asserts was specifically designed to mimic the aesthetics of the 1-800 Contacts website, such as a light blue box near the top of the page, or a discount offer for the consumer's first order, both of which were missing from the regular Warby Parker website page for contacts. (Compl. Ex. 3-5, 7; 1-800 Contacts Br. at 8-9 (highlighting the different versions of the Warby Parker page for contacts).) The page which plaintiff cites in its Complaint is labelled at the top "Warby Parker."

     e. <u>Sophistication of Consumers in the Relevant Market</u>

  As to the sophistication of consumers in the relevant market, the Court notes that here, the Complaint focuses on would-be consumers of 1-800 Contacts, an entirely online retailer of contact lenses. Consequently, the relevant consumer base, conducting internet searches in the year 2022, would likely be familiar with both the concept of paid search results and the significance of website address links—to infer otherwise would not be reasonable inference in light of the pleadings. Relatedly, the Court also concludes that the relevant consumer base here would be sophisticated enough to (1) review the results of their online search—including linked website addresses that will navigate them to a different website when clicked—before clicking on such links, and (2) review the contents of any website that they have navigated to before taking further action, such as making an online purchase and providing sensitive payment information.

### f. Likelihood of Confusion

After considering the relevant <u>Polaroid</u> factors as discussed above, the Court concludes that 1-800 Contacts has failed to plausibly allege a likelihood of confusion on the the part of an "appreciable number of ordinarily prudent purchasers" who searched for one of the 1-800 Contacts Marks and unintentionally navigated to the Warby Parker landing page for contact lenses. <u>Savin Corp. v. Savin Grp.</u>, 391 F.3d 439, 456 (2d Cir. 2004).

As explained above, the 1-800 Contacts Marks are strong and there are sufficient allegations, taken at face value at this stage, of bad faith on Warby Parker's part as to their decision to provide a different version of their landing page for contact lenses for consumers searching for 1800contacts.com. But these factors are insufficient. When "focus[ing] on the ultimate question of whether, looking at the products in their totality, consumers are likely to be confused,'" <u>Starbucks</u>, 588 F.3d at 115, the parties' marks are too dissimilar for reasonably sophisticated internet consumers to be confused as to whether they have navigated to, and are purchasing contacts from 1-800 Contacts instead of Warby Parker. Most significantly, Warby Parker's name is clearly displayed in both (1) the website addresses contained in search results for the 1-800 Contacts Marks and (2) the Warby Parker website.

First, as to the search results, reasonably sophisticated consumers would likely exercise substantial caution before clicking on any links to websites as they navigate the online marketplace. Contact lenses are products for which consumers are likely to pay close attention because they are placed on the corneas of the eyes and may affect the quality of the users' vision. As applied here then, even before navigating to the allegedly misleading Warby Parker landing page, these consumers would likely take the time to read and understand that any search results linking to Warby Parker's website—labeled as "Ads" and lacking any references to the 1-800

13

Contacts Marks—would send them to the Warby Parker website at warbyparker.com, and not 1800contacts.com.

Second, as to the Warby Parker website, these reasonably sophisticated consumers would likely exercise substantial caution even *after* clicking on any links to websites as they navigate the online marketplace, where they may be prompted to provide sensitive information ranging from home addresses to credit card numbers.  Here, even assuming that some consumers will mistakenly click on a Warby Parker paid search result and inadvertently navigate to Warby Parker's page, these consumers would then take time to meaningfully review the contents and layout of the website before taking any further action.

The Court concludes that reasonable consumers, having conducted this review of the Warby Parker website, are not likely to be confused as to whether they are about to purchase contact lenses from 1-800 Contacts instead of Warby Parker.  In particular, the Court highlights Warby Parker's landing page that allegedly "mimics" the look of 1-800 Contacts to mislead consumers.





(Compl. Ex. 4 (Warby Parker's landing page allegedly provided to consumers searching for the 1-800 Contacts Marks), Ex. 3 (1800contacts.com).)

As the first distinction between the two websites, the Court notes that the Warby Parker landing page displays the Warby Parker mark (1) at the top and center of its page and (2) in dark text (3) in front of a white background. In contrast, 1800contacts.com displays the 1-800 Contacts name (1) on the second row of text and to the left of the page and (2) in white text (3) in front of a dark blue background. Second, as to the allegedly problematic "blue box," a reasonable consumer is unlikely to become confused by Warby Parker's use of a single light-blue box when 1800contacts.com uses multiple *bars* that span the entire horizontal width of its website in different shades of blue. Third, as to Warby Parker's discount offer, not only is this unlikely to confuse online consumers who presumably and frequently see discount offers from all types of retailers, Warby Parker's website not only offers an inferior percentage discount (15% as opposed to 1-800 Contacts's 20%), but also displays it only once, compared to 1800contacts.com, which also displays its 20% discount offer in a separate banner at the top of the screen, even above its own 1-800 Contacts mark.

Finally, the Court notes that the Court's conclusions—that reasonable internet consumers would take time to review online search results and any websites that they may

15

navigate to—is consistent with the Second Circuit's opinion in <u>Savin</u>, which noted that "consumers diverted on the Internet can more readily get back on track than those in actual space, thus minimizing the harm to the owner of the searched-for site from consumers becoming trapped in a competing site." <u>Savin</u>, 391 F.3d at 462 n.13. In other words, to the extent that online consumers may make mistakes in navigation, they are well-positioned to quickly identify and rectify their mistakes. Here, even assuming that an appreciable number of reasonable consumers intending to purchase from 1-800 Contacts will click on an "Ad" search result clearly linking to warbyparker.com and not 1800contacts.com, they will then land on the Warby Parker website, with the Warby Parker mark displayed top and center on a website page that bears little resemblance to the 1-800 Contacts website and contains no references to the 1-800 Contacts Marks. In such circumstances, it is implausible that these reasonable online consumers would be confused as to whether the contact lenses sold on the Warby Parker site are related to 1-800 Contacts.

Accordingly, the Court concludes that 1-800 Contacts has failed to plausibly plead a likelihood of consumer confusion in this case. Warby Parker's motion will be granted as to the federal trademark infringement and unfair competition claims brought under the Lanham Act.

B.   <u>New York Trademark Infringement and Unfair Competition Claims</u>

The Court concludes that 1-800 Contacts has also failed to plausibly plead a claim for relief as to its claims for trademark infringement and unfair competition under New York common law.

i. <u>Applicable Law</u>

As to the state claims here, "[i]t is well-established that the elements necessary to prevail on causes of action for trademark infringement and unfair competition under New York common law 'mirror the Lanham Act claims.'"  <u>Gym Door Repairs, Inc. v. Young Equipment Sales, Inc.</u>, 331 F. Supp. 3d 221, 250 (S.D.N.Y. 2018) (quoting <u>Lorillard Tobacco Co. v. Jamelis Grocery, Inc.</u> 378 F. Supp. 2d 448, 456 (S.D.N.Y. 2005).  The one difference in the applicable standards for the four causes of action here is that "a viable common law claim for unfair competition requires an additional showing of bad faith."  <u>Id.</u>  See also <u>Soter Tech., LLC v. IP Video Corp.</u>, 523 F. Supp. 3d 389, 397 (S.D.N.Y. 2021) ("Under New York common law, the standards for trademark infringement and unfair competition are 'virtually identical' to the standard under the Lanham Act, 'except that [New York law] requires an additional showing of bad faith.'")

ii. <u>Application</u>

For the reasons explained in concluding that 1-800 Contacts has failed to plausibly plead a claim for relief for its federal trademark infringement and unfair competition claims, the Court concludes that 1-800 Contacts has also failed to plead a claim for relief for its trademark infringement and unfair competition claims under New York common law, which share pleading requirements with the federal trademark infringement and unfair competition claims.  Accordingly, the Court will grant the motion as to the trademark infringement and unfair competitions claims under New York common law.

CONCLUSION

After consideration of all the arguments of the parties, including those not expressly referenced, the motion for judgment on the pleadings is GRANTED.  The Clerk is

respectfully directed to terminate the motions (Doc 32, 39) and enter judgment for defendant.

SO ORDERED.

_____
P. Kevin Castel
United States District Judge

Dated: New York, New York
       June 27, 2022